## THE STATE v. FLUTCHER, Appellant.

Division Two, February 4, 1902.

1. **Criminal Law:** MOTION FOR NEW TRIAL: NEWLY-DISCOVERED EVIDENCE: NO AFFIDAVIT. In a criminal prosecution, defendant's motion for a new trial on the ground of newly-discovered evidence, not supported by affidavit either of defendant or a third person, was properly denied.

2. **Murder:** EVIDENCE: SUFFICIENCY. Defendant, a negro, had passed a saloon, when several parties came out, calling out, "Hurrah for McKinley," etc. He immediately turned, drew a revolver, and threatened to shoot decedent's brother, who had been standing near the

State v. Flutcher.

saloon; stating that he thought the brother was the one that hallooed at him. The next day as decedent was passing out of an alley, the negro shot him; saying that he missed his brother the night before, but would not miss decedent. Defendant's evidence, corroborated to some extent, tended to show that he was assaulted by decedent, and shot in self-defense. *Held* to support a conviction of first-degree murder.

3. **Bill of Exceptions:** TIME FOR FILING. Where the time for filing a bill of exceptions is extended "up to" June 28, a bill filed on that day is in time.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood*, Judge.

AFFIRMED.

*Edward C. Crow*, Attorney-General, and *Jerry M. Jeffries*, for the State.

(1)   The word "to" according to Webster, is interpreted "as far as," and Webster also defines "up till" as "to against." Anderson's Law Dictionary defines the word "to" to be a term of exclusion, unless by necessary implication it is used in a different sense.   If we interpret the words "up to" to include the last day named and if we can draw the conclusion that it was the intention of the court that the defendant should have until the twenty-eighth day of June, 1901, in which to file his bill of exceptions, then the bill is filed.in time.   But "to" an object named excludes the terminus named, consequently "up to" the twenty-eighth day of June would exclude that day and the defendant would only have to the twenty-seventh day of June, in which to file his bill of exceptions.   Montgomery v. Reid, 69 Me. 510; Bonney v. Morrill, 52 Me. 256.   (2) Courts do not favor the granting of a new trial on the grounds of newly-discovered evidence, and the mere fact that it is stated in the motion does not prove anything.   There must be an affidavit of the defendant or there must be an explanation as

to why the defendant does not make a proper affidavit. However, in this case, the record shows that no affidavits were filed, or, if filed, the record shows nothing of them. The presumption would be that the trial court properly ruled upon the matter, and not being incorporated in the record or the bill of exceptions in this case this court can not determine whether or not error was committed. The motions must be supported by affidavit. State v. Miller, 144 Mo. 26; State v. Lucan, 147 Mo. 70; State v. Tomasitz, 144 Mo. 86; State v. Nettles, 153 Mo. 464. (3) The instructions given properly declare all the law of the case. The court instructed in murder in the first degree, murder in the second degree and in manslaughter in the fourth degree. The defendant was given every advantage and every protection known to the law. While the instructions for murder in the second degree and manslaughter in the fourth degree properly declare the law, we need not notice them here because the defendant was convicted of murder in the first degree, and if the instructions upon that degree of the crime were proper the defendant can not complain. State v. Gans, 72 Mo. 374; State v. Nelson, 88 Mo. 126; State v. Wilson, 98 Mo. 440; State v. Glahn, 97 Mo. 679; State v. Smith, 80 Mo. 516.

SHERWOOD, P. J.—Defendant was indicted for murder in the first degree, because he shot Louis Roth to death with a revolver on the twenty-seventh day of August, 1900.

On behalf of the prosecution, the testimony disclosed, in substance and effect, this state of facts: Defendant is a negro and had been for sometime prior to the commission of this crime a resident of the city of St. Louis, and is about five feet six inches tall and weighs about one hundred and fifty pounds.

Louis Roth was a young man, and made his home with his father and mother, who resided at the corner of 2858 St. Louis avenue. He was twenty-three years old and five feet seven inches tall and would weigh about one hundred and six-

ty-five pounds. He had two brothers, one of whom was older and one, Edward Roth, who was younger than himself.

On Sunday, the day before the commission of this homicide, Edward Roth and a number of boys about his age (seventeen years) at about eight o'clock in the evening were standing on the southwest corner of Glasgow and Montgomery streets. The defendant, with a negro woman, came west on the south side of Montgomery street. The young men were standing in front of a grocery store and saloon, but none of them had been in the saloon. In the saloon were several men who were, from all appearances, having a "good time." The defendant and this negro woman had barely passed this corner when these men who were in the saloon came out and went east on Glasgow street. As they came out of the saloon some of their number hallooed "Hurrah! Hurrah for McKinley!" and others of their number hallooed things similar to that. The defendant, as above stated, was only a few steps away, but he turned around, drew a thirty-eight revolver out of his pocket, rushed back to where Edward Roth was standing, he being a little to the west of his companions, thrust the revolver into his face and said, "You white bastard, I'll make you respect my color as well as I respect yours; you white son-of-a-bitch, I'll kill you. I'll make all of you white bastards respect me regardless of nationality." Young Roth attempted to back away from the weapon saying, "Mister, don't shoot me. I have done nothing." The negro followed him keeping the weapon in his face, saying, "I think you are the one that hallooed at me." Roth retreated to the middle of the street all the while saying, "Mister, don't shoot me, I never done nothing." When they reached the middle of the street the defendant ceased his assault and rejoined his companion, who was waiting for him and passed on. This was the second time that Edward Roth had seen the defendant. Once before that he had seen him engaged in a game of craps, but even when this occurrence took place, did not know his name.

There is an alley running north and south from St. Louis avenue to Madison street, intersecting Montgomery and Benton streets. Shortly before sundown on the twenty-seventh day of August, 1900, Louis Roth went into a cigar store then standing at 2710 St. Louis avenue at the corner of this alley. There he met an acquaintance, John Barry. After talking a few minutes they started to Mr. Tierney's home, which is at Eleventh and Franklin avenue. Roth was a carpenter by trade and belonged to the Carpenter's Union. Tierney was the treasurer of that institution and Roth was going to his home for the purpose of paying his dues in that organization. To lessen the distance the two men undertook to pass through the alley above mentioned. They got into the alley about a hundred feet when the defendant and two other negroes came out of what was termed a gangway on the west side of the alley into the alley and passed south through the alley about fifteen feet ahead of Roth and Barry. The three negroes on reaching Montgomery street turned west and just as Roth passed from the alley into Montgomery street the defendant who had turned around and was waiting for his victim, took deliberate aim at Roth and saying to him, "I missed your brother last night, but you son-of-a-bitch, I'll not miss you," fired. Roth threw up his hands, turned to his friend and said, "Jack, I am shot." He staggered about fifteen feet west from the alley and fell. The defendant unsatisfied with the murderous work he had accomplished fired his weapon at deceased twice more, but an express wagon had dashed between the men and his aim was faulty. Roth was taken to the hospital but died as soon as reaching there. The ball, a thirty-eight calibre bullet, had entered the right side at about the eleventh rib, right at the juncture where it stops, it ranged slightly backwards escaping the right kidney, passed through the colon or large gut, through some of the small intestines and then into the left kidney where it severed a vein and an artery and at the same time shattered a kidney. After firing the three

shots the defendant crossed the street and ran on south through the alley; then through a vacant lot on Leffingwell avenue where there was a lot of weeds and he thus escaped the officer, who had pursued him for some distance and had fired three shots at him.

The next morning an officer was delegated to watch at the place where defendant had been at work. A negro woman appeared there and demanded the pay that was due him. She was shadowed to 909 South Ewing street, which is in the south lower part of the city, where the defendant was found in bed. He was immediately placed under arrest and the weapon he had used was found under his pillow.

He pleaded not guilty and also pleaded self-defense.

On the part of the defense, there was the testimony of defendant corroborated to a greater or less extent by several other witnesses that defendant was assaulted by Louis Roth, struck twice with a base ball bat, and knocked to his knees when he fired in self-protection the shot which killed Louis Roth.

The court below gave an excellent set of instructions, embracing murder in the first and second degree, manslaughter in the fourth degree and the law of self-defense. These instructions were so full and accurate as to leave naught to be desired; so that the exception of defendant at the close of the giving of the instructions given by the court, "on the ground that they did not cover all phases of the evidence in the case," can not prevail. The jury returned a verdict of guilty of murder in the first degree.

The point is made in the motion for a new trial that: "New evidence has been discovered which is material to the issues in the case, and that said evidence is not cumulative and has come into the possession of this defendant since the verdict in the case was rendered." This point was properly ruled against defendant, because the ground stated met with no support by affidavit either of defendant or others. [State v. Mc-

Laughlin, 27 Mo. 111; State v. Campbell, 115 Mo. 391; State v. Nettles, 153 Mo. 464; State v. Ray, 53 Mo. 345; State v. Musick, 101 Mo. 260; State v. Welsor, 117 Mo. 570; State v. Miller, 144 Mo. 26; State v. Tomasitz, Ib. 86; State v. Lucas, 147 Mo. 70.]

There is abundant testimony as already set forth, to warrant and support the verdict returned, and the fact that the testimony for the defense conflicts with that of the State, has no bearing on the force and effect of the verdict.

The last order of record in reference to extension of time for filing the bill of exceptions, is in these words, "be again extended up to the twenty-eighth day of June, 1901," and the State contends that inasmuch as the bill was filed *on that date,* such filing was too late. We do not favor this view. The words *"up to"* constitute a colloquial expression, a slang phrase. [Vol. 6, Cent. Dict.] The word *"to"* which was evidently the controlling word in this connection, and instance, is sometimes a word of *"inclusion."* [Cent. Dict.] In this sense we hold it was thus used in the case at bar and, therefore, that the bill was filed in time.

In conclusion, we make no doubt that defendant was in all respects fairly tried, and convicted on testimony amply sufficient, so that it only remains for us to affirm the judgment and to direct that the sentence of the law be executed. All concur.