**LeRoy KEATON, Plaintiff-Respondent,**

**v.**

**Walter GOOD, Defendant-Appellant.**

No. 7979.

Springfield Court of Appeals.

Missouri.

Oct. 12, 1961.

Ralph M. Crow, Eugene E. Northern, Breuer, Northern & Crow, Rolla, for defendant-appellant.

T. A. Shockley, Waynesville, Claude T. Wood, Richland, Harold S. Hutchison, Vienna, for plaintiff-respondent.

RUARK, Judge.

This is an appeal from a plaintiff's judgment on verdict arising out of a collision between a mare which plaintiff was riding and a pickup truck being driven by the defendant. Plaintiff being the verdict holder, we attempt to sort out and relate the facts which we believe to be most favorable to his verdict.

The event occurred at a night horse show sponsored by a civic-service organization at Crocker, Missouri. The arena or track consisted of a woven-wire fenced-in area, roughly in the shape of a horseshoe, with the toe or calk to the east and the heel or open end on the west. The entry gate for the contestants lay on the extreme south end of the west side or heel of the horseshoe and the exit gate was at the extreme north end of the heel. Both these gates were 12–14 feet wide, divided in the middle so they could be swung back to permit entry and exit of the horses. The finish line was some 10–15 feet inside the north gate. Spectators' cars were parked around the horseshoe arena, although, necessarily, a space was left for the gates. The line of cars parked on the north side of the horseshoe extended on west from the heel of the horseshoe for a distance we are unable to determine.

Concerning ourselves with only the parking on the west end, a row of cars was

parked at the fence between the gates. Another row of cars was parked some distance to the west, thus leaving a space between the two rows which is variously referred to as an open area for participants in the events, a lane, a path, a road, an alleyway, a runway. This lane "curved" and. the width "varied how far the cars were pulled down there." Different witnesses put the width as low as 20–30 feet and as high as 66 feet. Besides being used by the contestants, this lane had been used by some of the spectators in driving to their parking space on the south of the arena. Somewhere at the north end of the line of cars on the west side of the lane or somewhere in the line extending westward from the north side of the arena, there had been left a gap or open space which spectators used in driving in. But where that space was ("over here," "in there"), or whether it still remained open at the time of plaintiff's injury, we are unable to say. The picture exhibit shows the arena to have been lighted with flood lamps, but we have no information as to whether or not this area outside was lighted.

Plaintiff had entered his mare in the last event of the evening. Although the mare, a high-spirited animal with a sweet and gentle disposition, is the chief actress and tragic heroine in this drama which fills a transcript of 360 pages, the evidence leaves her nameless. The event in which Nameless ran was a timed event in which each contestant ran singly and against time. The "pattern" of the race was that the horses entered the south gate from a running start, circled the horseshoe arena and (presumably) on the outside of three barrels strategically placed,[1] near the fence, crossed the finish line at top speed, then went on out through the north exit gate. On this home stretch of the race the horse would be running mostly westward but at a slant or angle to the south. "The fence and track before it reaches the exit gate veers to the southwest." Once out the exit opening and past the swung-back half of the gate and the end car of the row of cars parked against the west fence, the contestant curved farther to the south in the lane or area outside. There was considerable evidence on behalf of plaintiff that the contestant "has got to make a turn" after he comes out the gate. At frequent intervals during all the evening the loudspeaker had been blasting the admonition to "keep the gates clear," or "keep the area open," "keep that alley or * * * that exit clear." Plaintiff had heard these warnings throughout the evening and said, "It was supposedly to have been guarded, but I never seen it." He "understood" guards were there, although the management had not told him there were; and in fact the evidence shows that guards were stationed on either side of the exit gate for the purpose of keeping them clear for the contestants.

Defendant was a spectator. When he arrived at the show he drove his pickup truck down this areaway we have been talking about and parked on the south side of the horsehoe. About the time the last race was to begin and the participants assembled outside the south gate, defendant decided to leave. He gathered his family and started to go out by the same course he had entered. Nameless was the first runner in this last race of the evening. She started some distance back west from the south gate, and another horse started running beside her "a couple of jumps."[2] About the time Nameless reached the starting line inside the gate and the horse which had started with her was being pulled up and to the side outside the gate, the defendant came around from the south and drove so close in front of the starter horse that it was compelled to rear up over it. (Plaintiff says he did not then see the truck.) While Nameless was circling the track (she ran the course in approximately 10 seconds), the defendant in his truck worked his way

---

1. In all the mass and welter of the evidence we have not been able to discover where these barrels were placed.

2. The reason for having another horse start is to urge the contestant horse to start at a fast speed.

through the men and horses in the areaway around the south gate and "up to" the north or exit gate. During this period the loudspeaker was broadcasting warnings to keep the area clear, and several people shouted warnings to defendant to "get that pickup out of the way." Nevertheless, defendant continued. (As stated, this all happened within the space of a few seconds.) One of the guards at the south gate ran out and threw his hands up to stop the defendant. Nameless, running hard, close to the north fence, came out of the exit gate on a "veer" or slant to the left, "turned in the natural pattern, the way they were running that night," and struck the right front fender of the truck "at about a 45-degree angle" with her right shoulder. After the horse left the exit gate the crash was almost instantaneous. "Just [snaps fingers] you could judge in a second of time. Just like that [snapping fingers]." From this collision resulted the injuries to mare and man. Plaintiff says that the truck was still moving when the collision occurred. Others said it had just stopped. Others weren't sure whether or not it was completely stopped.

One of the hotly disputed issues was the exact location of the truck at the time Nameless came running out of the gate. It was some few feet west of the line of cars parked along the west fence. Some witnesses say it was about the center of the open lane, "right in the main runway." One of plaintiff's witnesses said the collision occurred about 20 feet west of the gate. The pickup was "just entering the horse lane," "very little south" of the south end of the gate. Two of plaintiff's witnesses said the pickup "pulled in front of the horse" and there was not room for plaintiff to get around. As one of them put it, "If you get to the lane and there is something on each side of you and they park that truck there and there isn't any way for your horse to get up there, how are you going to get up there?" After the collision it was necessary to move the truck before the race could be continued because it was "in the way of" the other

contestants. There was evidence that Nameless was trained for racing, not as a roping horse, and, although she was easily controlled, she could not be safely stopped from running at top speed within the approximately 35 feet which she had traveled from the finish line inside the gate to the truck.

As to the exact location of the truck in reference to the normal line of travel of the mare coming out the gate, the surrounding circumstances in reference to the course, direction, and width of the area immediately outside the gate, and the parking of cars, we have had some difficulty because plaintiff's diagram exhibit, to which a number of witnesses referred, is not before us. Moreover, over and over the testimony in reference to this diagram (and, as a matter of fact, also to defendant's diagram) is replete with such baffling remarks as (the witnesses evidently indicating) "right in here," "at about this point," "back here," "from here to here," "there were also cars out in here," et cetera. Furthermore, our confusion, and probably the witnesses' also, is compounded by questions of counsel such as, "How close was the horse to the pickup truck when the collision occurred?"

Defendant's evidence was that the truck was farther south of the gate and that Nameless made quite a wide circle before colliding with the truck; that plaintiff was whipping Nameless as she came out the gate. Plaintiff's evidence was not only that plaintiff was not whipping her but that he had no whip. Defendant said he did not hear anyone shout at him. He heard the loudspeaker after he passed the south gate, did not stop when he heard it, but continued "until I got down there to the gate." Plaintiff's evidence was that after the collision defendant said, "Move the pickup, take the boy to the hospital, wherever he has to go, and I will take care of everything." Defendant denied making this statement. His wife also said he did not make such statement. She was not present all of the time but she was certain he didn't say it for the

cogent reason that "I have been married to him for fourteen years."

Most of appellant's claims of error are in respect to plaintiff's instruction 1, which is as follows:

"The Court instructs the jury that if you believe and find from the evidence that on or about the 22nd day of August, 1958, the plaintiff had entered a mare in the horse show at Crocker, Pulaski County, Missouri, and if you further find and believe from the evidence that the plaintiff entered his mare at the south gate of the track at said horse show and proceeded around said track to the north gate and if you further find and believe from the evidence that at the time the mare which the plaintiff was riding reached the north gate and was leaving the track mentioned in evidence, said mare was going at full speed, and if you further find that the plaintiff was at all of such times exercising ordinary care for his own safety and for the safety of his horse, and if you further find and believe from the evidence that at the time the said mare being ridden by plaintiff reached the north gate, mentioned in evidence, the defendant carelessly and negligently drove and operated his pickup truck up to said north gate and directly in front of plaintiff's mare and so near the said mare that it was impossible for plaintiff to stop his mare or swerve to avoid a collision with said pickup truck, and if the jury further finds that at the time the defendant so drove his pickup up to said north gate and directly in front of plaintiff's mare, if they so find, that the defendant knew, or should have known by the exercise of ordinary care, that a collision between his vehicle and the plaintiff's mare might occur, and if you further find and believe from the evidence that the defendant carelessly and negligently permitted his truck to come into violent collision with the mare which plaintiff was riding and that as a direct and proximate result thereof a collision occurred between the defendant's said truck and the mare which the plaintiff was riding and if you further find and believe from the evidence that as a result of said collision, if you so find, the plaintiff was thrown from his said mare and if you further find and believe from the evidence that as a result of said collision, if you find there was a collision, the plaintiff sustained injuries and the plaintiff's horse was injured and damaged, then you should find the issues for the plaintiff and against the defendant on the plaintiff's verdict and your verdict should be for the plaintiff and against the defendant on the plaintiff's petition, provided that you do not find that the plaintiff was guilty of contributory negligence as set forth in Instructions Nos. 6 & 7."

The first complaint against the instruction is that it did not hypothesize the facts to support a finding of negligence *and then direct the jury to determine that such facts constituted negligence*. Headrick v. Kansas City Southern Ry. Co., Mo., 305 S.W.2d 478; McCollum v. Winnwood Amusement Co., 332 Mo. 779, 59 S.W.2d 693; see also Kitchen v. Pratt, Mo.App., 324 S.W.2d 144, 148; Evans v. Colombo, Mo.App., 311 S.W. 2d 141, 146. But in each of those cases the facts so hypothesized were such that the conduct, either affirmative or negative, of the defendant might or might not have constituted negligence, and thus negligence itself became a jury question. In the Headrick case it was a question of whether the *method* used was proper; in McCollum v. Winnwood Amusement Co., whether the *construction* of a slide was such as to constitute negligence; in Evans v. Colombo, whether being on the wrong side of the road *following a skid* was negligence. In Kitchen v. Pratt the defendant was on the wrong side of the road *after a blowout*. In such cases, since the hypothesization of the

evidence did *not* include facts which necessarily excluded all but one theory as to the cause of the injury, the defendant was not guilty of negligence as a matter of law.

■ But where the facts properly hypothesized, if found to be true, call for only one conclusion, to-wit, that of negligence, and that conclusion is one with which all reasonable men could not disagree, then negligence results as a matter of law and it is not necessary to submit the question of negligence to the jury. Butler v. City of University City, Mo.App., 167 S.W.2d 442 (14); Connole v. East St. Louis & S. R. Co., 340 Mo. 690, 102 S.W.2d 581, 590; Cole v. Long, 207 Mo.App. 528, 227 S.W. 903, 905–906; Swain v. Anders, 349 Mo. 963, 163 S.W.2d 1045, 1052; McCollum v. Winnwood Amusement Co., supra, 59 S.W. 2d 693, 697. As a matter of fact, such submission has been said to be improper. Bagby v. Culberson, Mo.App., 273 S.W. 209(2).

Now we return to the hypothesization which carried the plaintiff's theory.

(a) The mare was entered in a horse show race, starting at the south gate, went around the track, and was leaving the north gate at full speed.

(b) The defendant carelessly and negligently drove his truck *up to the north gate and directly in front of the mare and so near that it was impossible for plaintiff to stop or swerve her and so avoid a collision.*

(c) At the time defendant drove in front of the mare he knew or should have known by the exercise of ordinary care that a collision might occur, and the defendant *carelessly and negligently* permitted his truck to come into violent collision with the mare, and that as a direct result thereof a collision occurred, et cetera.[3]

We believe that the hypothesization submitted a state of facts which, if found to be true, reasonable men would have to agree was negligence. To deliberately drive in the path of a racing horse under those circumstances, knowing a collision may occur, is negligence as a matter of law. Appellant cites no authority to the contrary and makes no contention that plaintiff did not make a submissible case on primary negligence. It is true that there was disagreement in regard to certain facts, the principal bone of contention being the location of the truck at the time of collision. But there is no disagreement or divergence in either evidence or theory as to *how* the truck came to be in such location, wherever it was. By all the evidence the defendant *voluntarily* drove it there; hence there was no divergence, issue, or contention as to that fact comparable to the skid or blowout cases, or the proper method used or the proper construction of an article.[4] We overrule this contention.

The next contention is that the instruction is broader than the pleadings because it requires a finding that the defendant knew or should have known by the exercise of ordinary care that a collision between his vehicle and the plaintiff's mare might occur, and thus submits an issue not pleaded.

It would appear to us that, if in fact chargeable knowledge was not pleaded, defendant's attack should have been on the petition, not on the instruction, and that the requirement of a finding of chargeable negligence *in addition* to the other facts submitted only added a further burden and hence was not reversible error.

■ A statement or finding that the defendant negligently caused or permitted an unsafe condition is equivalent to a statement or finding that the defendant

3. In Smith v. Wabash R. Co., Mo., 338 S.W.2d 16(2), an instruction which hypothesized the facts and then required a finding that appellant "was thereby negligent" was approved.

4. Hausherr v. Kansas City Public Service Co., Mo.App., 268 S.W.2d 433(1, 2, 9); Hooper v. Conrad, 364 Mo. 176, 260 S.W. 2d 496, 500.

knew or should have known the condition to exist.[5]

■ An instruction need not follow the language of the pleadings. It is sufficient if it falls within the fair implication or "within the purview" of the petition (Barnes v. Elliott, Mo.App., 251 S.W. 488, 490), its "legal intendment," (Sanders v. Armour & Co. of Delaware, Mo.App., 292 S.W. 443, 445), or what it "inferentially" charges (Finn v. United Rys. Co. of St. Louis, Mo.App., 267 S.W. 416, 420), and, of course, is justified by the evidence.

■ We think the petition furnished a basis for including the submission of actual or imputed knowledge. It charged that the defendant *carelessly and negligently* drove up to the gate and in front of the mare and, by driving his truck into the runway of horses, *carelessly and negligently* permitted his truck to collide with the mare, *although he had been warned to keep all vehicles away from the gate and out of the way of the horses being raced;* and that *owing to his carelessness* in driving his truck into the path of the mare the collision occurred.

The cases relied upon by the appellant are those in which the instruction permitted recovery for an act or thing *different* from that pleaded as a basis for recovery in the petition.[6]

We can find no room for the contention that the instruction was broader than the pleadings.

■ It is next contended that the instruction was not based on facts in evidence because there is no evidence (a) that defendant drove the truck "up to" the north gate, (b) that defendant drove his truck directly in front of the mare, or (c) that he drove so near the mare that it was impossible for the plaintiff to swerve his mare and thus avoid a collision.

The words "up to" (a colloquial expression, State v. Flutcher, 166 Mo. 582, 66 S.W. 429) have a relative meaning depending upon the sense in which they are used and understood. There was no contention that defendant drove his truck so that it touched or entered the gate. All the evidence is that he drove it up the areaway and to somewhere in the immediate vicinity of the gate. The defendant himself testified that "I kept driving until I got *down there to* the [north] gate." We see little difference in the expressions "up to the gate" and "down there to the gate." Certainly the defendant didn't mean by the words "down to" to say more than he was somewhere in the vicinity of the gate. The gander should be entitled to use the same language as the goose. "Up to" could be interpreted as close, but not quite, or approximately even with the south end of the gate. We think that in view of the evidence and the obvious contentions of the parties the jury could not have been misled.

As to the contention that there was no evidence that the defendant drove in front of the mare, there was direct testimony that the defendant did so.

As to whether there was evidence that it was impossible to swerve the mare, plaintiff testified the truck was still moving. Nameless, trained to race, but not as a roping horse, crossed the finish line at top speed. She couldn't have been stopped within the distance necessary to avoid collision. The collision happened almost instantaneously. "The pickup * * * was pulled up here so the horse didn't have room to get around." "Sure he would have to get out past these cars, but the pickup was pulled up there setting right there. How

5. See Rueter v. Terminal R. Ass'n of St. Louis, Mo.App., 261 S.W. 713, 717; Berberet v. Electric Park Amusement Co., 319 Mo. 275, 3 S.W.2d 1025, 1026, 61 A.L.R. 1269.

6. See Stupp v. Fred J. Swaine Mfg. Co., Mo., 229 S.W.2d 681, 685; State ex rel. Central Coal & Coke Co. v. Ellison, 270 Mo. 645, 195 S.W. 722.

could he get away?" We think this and other evidence justified the inference that the plaintiff did not have time, space, or opportunity to swerve his mare so as to avoid the collision. We think the evidence and the favorable inferences to be drawn therefrom justified the inclusion of such words in the submission.

■ The next contention is that the instruction is erroneous because it did not require the jury to find as an essential factual issue that the plaintiff exercised ordinary care after he left the north gate.[7]

Plaintiff's instruction in regard to that was that if the jury found * * * "that plaintiff entered his mare at the south gate * * * and proceeded around said track to the north gate * * * *that at the time the mare * * * reached the north gate and was leaving the track * * * said* mare was going full speed and * * * plaintiff was *at all such times exercising ordinary care* for his own safety and for the safety of his horse" (then follow the collision, injury, and direction of verdict) * * * "*provided that you do not find that the plaintiff was guilty of contributory negligence, as set forth in Instruction Nos. 6 & 7.*"

Defendant's instruction 6 submitted contributory negligence in that after crossing the finish line and passing out the north gate the plaintiff permitted his mare to continue at a fast speed before bringing her under control, or to a stop, or permitted the mare to turn to the left of the area reserved for participants in the race and to enter an area south of such, where plaintiff knew or should have known that persons and vehicles were likely to be, and that plaintiff knew or should have known that by permitting the mare to enter such south area at a fast speed before bringing her under control, he and his mare were likely to be injured. If plaintiff was so contributorily negligent, then defendant was entitled to a verdict even though defendant was negligent under other instructions.

Defendant's instruction 7 submitted the proposition that if plaintiff saw the truck in time to avoid the collision by stopping or turning his horse aside and failed to use ordinary care in stopping or turning aside, then the verdict should be for defendant even though the defendant was also negligent.

Defendant argues that plaintiff's instruction leaves a hiatus in the negation in that the jury could have found that *after the plaintiff left the exit gate* the plaintiff was negligent, and yet, under the instruction, he could recover.

We do not have to decide whether the statement in plaintiff's instruction (that plaintiff was at all *such* times) might possibly be interpreted to cover the exercise of reasonable care *only* up to and including the time the mare passed out of the gate, thus leaving in limbo that period *after* the mare passed out the gate,[8] because the defendant's two contributory negligence instructions dealt with what happened outside the gate and contained defendant's theories of contributory negligence. Plaintiff's instruction expressly limited the direction of a verdict by a condition that the jury not find plaintiff guilty of contributory negligence as set forth in such instructions. We think this reference was sufficient.[9] Hence we find no merit in this assignment.

7. As to whether the failure to negative contributory negligence is an omission of "an essential element" of plaintiff's claim, see Shepard v. Harris, Mo., 329 S.W.2d 1(6).

8. If so, the addition of the little word "such" could be a damaging excess of wordage.

9. Scott v. Missouri Insurance Co., Mo. App., 246 S.W.2d 349, 354(4); Sollars v. Atchison, Topeka & Santa Fe R. Co., 239 Mo.App. 410, 187 S.W.2d 513, 518 (3); Macklin v. Fogel Const. Co., 326 Mo. 38, 31 S.W.2d 14, 19; Keene v. City of Springfield, Mo.App., 152 S.W.2d 220, 223; Bashkow v. McBride, Mo.App., 177 S.W.2d 637, 639; Muehlhausen v. St.

Appellant's final contention is that the court should have sustained defendant's motions for directed verdict because "all the evidence showed" that plaintiff was guilty of contributory negligence as a matter of law in that:

Plaintiff rode his mare, at top speed, still whipping her, out of the north exit gate into an area where he knew there were other people, horses, and vehicles; and, although he knew that all evening the loudspeaker had been warning to keep the gates clear prior to and at the time of the race, he did not make any investigation as to whether the gates and areas were guarded.

The plaintiff verdict-holder is entitled to the benefit of all favorable evidence in the case and inferences which can reasonably be drawn therefrom, unless such favorable evidence or inferences are contradicted by plaintiff's own testimony or are opposed to plaintiff's theory of the case.[10]

We cannot here pass upon the weight of the evidence. Contributory negligence is a question of fact for the jury unless the evidence is so strongly against the plaintiff as to leave no room for reasonable minds to differ on the issues submitted to the jury.[11]

Plaintiff, a participant in the sport of racing, assumed the ordinary risks inherent in the activity in which he was engaged, but he did not assume those risks which were associated with the negligence of others. Page v. Unterreiner, Mo.App., 106 S.W.2d 528; Schamel v. St. Louis Arena Corporation, Mo.App., 324 S.W.2d

375; McCormick v. Lowe & Campbell Athletic Goods Co., 235 Mo.App. 612, 144 S.W.2d 866.

The sponsors of the affair owed the plaintiff the duty to exercise care commensurate with the circumstances to see that no injury was occasioned to him. Edling v. Kansas City Baseball & Exhibition Co., 181 Mo.App. 327, 168 S.W. 908, 910; Nephler v. Woodward, 200 Mo. 179, 98 S.W. 488. And plaintiff was not required to make a critical inspection of the arrangements in advance but had the right to rely upon the assumption that due care had been taken for his safety, until the danger became so glaring and obvious that no reasonably prudent person would have subjected himself to it. 65 C.J.S. Negligence § 118c, p. 715; Humbyrd v. Spurlock, Mo.App., 345 S.W.2d 499, 503, and cases cited in footnote 7.[12]

It is unquestionably true that Nameless was running at top speed when she crossed the finish line, but as to the plaintiff's still whipping her when she went out the gate there is decided conflict. Plaintiff's evidence is not only that he did not whip the mare, but that he *carried no whip*.

As to whether there were guards at the gate, the evidence shows there were such. Had plaintiff made an investigation in order to determine such fact it would not have changed what happened.

As to there having been people, horses, and vehicles in the "area," vehicles were parked on each side of this area or lane and north of the exit gate. Other than that there is no evidence of any

Louis R. Co., 91 Mo. 332, 2 S.W. 315, 321; see Moore v. Ready Mixed Concrete Co., Mo., 329 S.W.2d 14, 23; see State ex rel. Snider v. Shain, 345 Mo. 950, 137 S.W.2d 527, 531.

10. McVicar v. W. R. Arthur & Co., Mo., 312 S.W.2d 805, 65 A.L.R.2d 785; Pieper v. Lewis, Mo.App., 321 S.W.2d 4; Willis v. Wabash R. Co., Mo., 284 S.W.2d 503.

11. Adkins v. Sutherland Lumber Co., Mo. App., 307 S.W.2d 17, 18; Daniels v.

Banning, Mo., 329 S.W.2d 647, 652; Pender v. Foeste, Mo., 329 S.W.2d 656, 659.

12. And there is no exact test or formula by which such condition exists. Each case must be determined upon its own facts. Coats v. Sandhofer, Mo.App., 248 S.W.2d 455(7); Philippi v. New York, Chicago & St. L. R. Co., Mo.App., 136 S.W.2d 339, 341.

 actually out *in* the lane except the defendant's pickup truck. There were men and horses congregated in the south end of this lane. That is where the contestants entered to start their separate races. There is no evidence that their presence would, or did, constitute any interference with a horse and rider leaving the north gate. There is no evidence that the north end of this lane, in the immediate vicinity where Nameless went out the exit gate, was occupied by men or horses, except the guards or supposed guards at the gate.

It is urged that the continuous warning by loudspeaker to "keep the gates clear" was a warning to plaintiff that the gates were probably blocked. We think the continued admonition of those in charge to the spectators to "keep the gates clear" could have been accepted by him as some assurance that those in charge were alert in the discharge of their duty to keep the exit free. At any rate, had plaintiff made any investigation prior to the race he would not have found defendant's truck there.

Nor can we say plaintiff was guilty of contributory negligence as a matter of law in not seeing the pickup truck approaching the north gate. He was occupied with riding Nameless at top speed and keeping her outside the barrels. For only a few seconds while on the home stretch was he facing the west. He was inside a flood-lighted area, and between him and the lane where the truck approached was a row of cars. Had he seen the truck going north on the lane it is at least a jury question as to whether he would have reason to expect, until it was too late, that it would continue into the space where the collision occurred.

We cannot say that the plaintiff was guilty of contributory negligence as a matter of law.

The judgment is affirmed.

STONE, P. J., and McDOWELL, J., concur.