**WILSHIRE CONSTRUCTION COMPANY, a Missouri Corporation, Appellant,**

v.

**UNION ELECTRIC COMPANY, a Missouri Corporation, Respondent.**

**ALFRED H. MAYER COMPANY, a Missouri Corporation, Appellant,**

v.

**UNION ELECTRIC COMPANY, a Missouri Corporation, Respondent.**

**SPARTAN BUILDERS, INC., a Missouri Corporation, Appellant,**

v.

**UNION ELECTRIC COMPANY, a Missouri Corporation, Respondent.**

**R. G. B. CONSTRUCTION COMPANY, a Missouri Corporation, Appellant,**

v.

**UNION ELECTRIC COMPANY, a Missouri Corporation, Respondent.**

**WIELAND–SUGRUE, INC., a Missouri Corporation, Appellant,**

v.

**UNION ELECTRIC COMPANY, a Missouri Corporation, Respondent.**

**No. 54800.**

Supreme Court of Missouri, Division No. 2.

March 8, 1971.

Lewis, Rice, Tucker, Allen & Chubb, Arthur R. Tucker, St. Louis, for plaintiffs-appellants.

William H. Ferrell, Keefe, Schlafly, Griesedieck & Ferrell, and Stewart W. Smith, Jr., St. Louis, for defendant-respondent Union Electric Co.

HENRY I. EAGER, Special Commissioner.

Five plaintiffs, each being a subdivider and builder of residential properties, sued Union Electric Company for alleged overcharges collected under contracts for the installation of underground wiring. Some of the suits involved two or more subdivisions and two or more counts. The amounts thus claimed varied from approximately $6,900 to more than $36,000, and totalled approximately $81,000. We have jurisdiction. All of these cases were consolidated under the title first shown above. A summary judgment was entered for the defendant upon its motion. An after-trial motion was overruled and the plaintiffs duly appealed. At this point we note the plaintiffs do not contend that there are any material issues of fact, or that a summary judgment could not properly have been entered for one party or the other. The sole issue involved the proper construction of a Rate Schedule filed by defendant, and perhaps of the contracts based upon it. The suits are identical except as to the differing tracts of land and the amounts involved.

On August 24, 1965, defendant filed with the Missouri Public Service Commission its Rate Schedule, designated as Section XII, G. 3, Schedule 5, of its General Rules and Regulations. The determination of this case depends upon the construction of a paragraph thereof which we quote: "3. *Underground Extensions to Residential Subdivisions.* * Underground service will be extended throughout an entire residential subdivision, consisting of a number of houses and/or multi-family dwellings and incidental common facilities which are provided primarily for the benefit of the residents of said subdivision, upon the request of the initial owner, developer or trustees of said subdivision or other persons having authority to contract on behalf of the owners of the individual premises therein, provided that there is no engineering, operating, construction, safety or legal reason which would in Company's judgment make it inadvisable to make the underground installation, and provided further that such owner, developer or trustees shall pay in advance to Company without right of refund the amount, if any, by which Company's estimated total underground extension cost to said subdivision exceeds 1.5 times the estimated total annual revenue to be received by Company therefrom. * Indicates change."

Pursuant to this schedule contracts were executed with all of the plaintiffs (individually) in each of which it was agreed that defendant would provide underground electric service facilities "throughout the property" at a stated (estimated) cost, and that the owner should construct certain residential structures thereon, each to be equipped with certain designated electrical appliances, with a stated, though estimated, annual revenue to defendant from such buildings. Each plaintiff was required to pay the sum or sums for which it has sued, being the cost referred to above, "without right of refund"; presumably, those amounts were all paid. The various contracts were executed in 1966, 1967 and 1968. The plaintiffs now claim that the amounts so charged were not justified or

permitted by the Rate Schedule, that a sum of 1.5 times the annual revenue in each case exceeded the estimated cost of installing the service *"to said subdivision"* (italics ours) and that no payment was legally required; hence, the claim is made of an overcharge to each plaintiff.

■ It was suggested by defendant in the trial court that perhaps these claims should have been made to the Public Service Commission. We note the suggestion; it is not pressed here, since defendant obtained a final judgment. That Commission does have exclusive jurisdiction of all utility rates, but when a controversy arises over the construction of a contract or of a rate schedule upon which a contract is based, and a claim of an overcharge is made, only the courts can require an accounting or render a judgment for the overcharge. The Public Service Commission cannot "enforce, construe nor annul" contracts, nor can it enter a money judgment. May Dept. Stores Co. v. Union Electric Light & Power Co., 341 Mo. 299, 107 S.W.2d 41; Katz Drug Co. v. Kansas City Power & Light Co., Mo.App., 303 S.W.2d 672; Great Northern Railway Co. et al. v. Merchants Elevator Co., 259 U.S. 285, loc. cit. 291, 42 S.Ct. 477, 66 L.Ed. 943.

■ Plaintiffs and defendant both assert that the issue here is solely one of law. Each also asserts that the terms of the controverted Rate Schedule are clear and unambiguous, although each insists upon a different interpretation. However, that disagreement does not in itself make the terms of the contract ambiguous. Mickelberry's Food Products Co. v. Haeussermann, Mo., 247 S.W.2d 731; Kalen v. Steele, Mo.App., 341 S.W.2d 343; Needles v. Kansas City, Mo., 371 S.W.2d 300. In such event the question is to be decided by the court as a matter of law. Commerce Trust Co. v. Howard, Mo., 429 S.W.2d 702.

The entire substance of plaintiffs' claims is that the provision for payment of the amount by which the defendant's "estimat-

ed total underground extension cost *to said subdivision* exceeds 1.5 times the estimated total annual revenue * * *" (italics ours) means only the cost incurred in running an extension *to* the boundary lines of the subdivisions in question; and, hence, that defendant may not use its estimated costs for installing the lines throughout the respective subdivision, and charge plaintiffs the difference between the latter cost and 1.5 times the estimated annual revenue, which it did. Plaintiffs' arguments are based largely upon their construction of the word "to."

■ We look first at the cases expounding the rules for the construction of unambiguous contracts. The courts seek to ascertain the intent of the parties by giving to the language used its natural, ordinary, and common sense meaning, but they also look to the entire contract; and the court should consider the object, nature and purpose of the agreement. Brackett v. Easton Boot & Shoe Co., Mo., 388 S.W.2d 842; Kalen v. Steele, Mo.App., 341 S.W.2d 343; Industrial Bank & Trust Co. v. Hesselberg, Mo., 195 S.W.2d 470; 17 Am.Jur.2d Contracts, § 246 et seq. In Am.Jur (just cited), it is said also that the spirit, purpose and substance of the agreement must control rather than its letter, and that definitions from dictionaries, etc., are not to be used alone, without reference to the facts and circumstances of the case. We seek now to apply these rules to the Rate Schedule.

■ Plaintiffs say, quoting from Webster's (2nd International) that the word "to" is used: "Primarily to express the relation of direction of approach and arrival making its governed word denote the terminus." Webster's contains nearly two columns of definitions for "to." Another definition defines it as a functional word to indicate "purpose, intention, tendency, result or end * * * as, for the purpose of * * *." Black's Law Dictionary (4th Rev.) is also cited for the definition that it is "ordinarily a word of exclusion,

when used in describing premises; it excludes the terminus mentioned"; but the same text also says that it may be a word of inclusion and may also mean "into." We may thus see the fallacy of relying solely upon definitions of a single word. Plaintiffs cite also on the meaning of "to": Hoffman v. Bigham, 324 Mo. 516, 24 S.W.2d 125; Bloch Queensware Co. v. Smith, Saxton & Co., 107 Mo.App. 13, 80 S.W. 592; Roach v. Lacho, Mo., 402 S.W.2d 344; Montgomery v. Reed, 69 Me. 510 (1879); Littlefield v. Hubbard, 120 Me. 226, 113 A. 304; and Rogers v. City of Jackson et al., 251 Mich. 256, 231 N.W. 621. These are cases construing the meaning of the word "to" in various situations. In Hoffman, it was required that a publication be continued "to" the day of sale; it was held that the required 20 insertions must precede the date of sale. In Bloch, supra, it was held that an order granting time "to" a certain term for the filing of a bill of exceptions only included the first day of the term; also, that if a boundary is extended "to" a field, the field itself will not be included. But that Court further said that, while the word is generally a word of exclusion, it has no one specific meaning in a legal sense, and that its meaning should be ascertained "from reason and the sense in which it is used." In Roach, supra, one issue was the alleged violation by plaintiff of the statute providing that in certain instances a vehicle shall not be driven "to the left side of the roadway," including any time when it was within 100 feet of an intersection. The Court construed "to" as meaning "on" or "upon," but it actually sought the true intent of the statute and the nature of the prohibited act. If either of the words "on" or "upon" was substituted for "to" in our case plaintiffs' claims would be substantially foreclosed. It is difficult to see why plaintiffs cited that case. Montgomery, supra, a very old Maine case, held that the phrase "to the shore" of a tidewater river, excluded the flats which were ordinarily considered to be the "shore." In Littlefield, supra, also a Maine case, the Court held that,

in considering a deed of real estate, the word "to" is ordinarily a word of exclusion unless " ' * * * by necessary implication [it] is manifestly used in a different sense.' " In Rogers, supra, a Michigan case, the Court considered a statute which authorized the Highway Commissioner to lay out and build a road on a certain route "to" the City of Jackson. It was held that the road ended at the city limits of Jackson, but, in large part, this result was achieved by virtue of other statutes which indicated that the legislative purpose was to improve rural roads, and not to construct roads within towns or cities.

Plaintiffs call attention to the fact that the phrase "throughout an entire residential subdivision" is used in the first part of the controverted paragraph (actually all one long sentence); also that when the phrase "to said subdivision" is used later, it is obvious that "to" does not mean the same thing as "throughout." The words are used in different contexts, and in the first instance the phrase is used in what really constitutes a definition of a "residential subdivision"; following that phrase the rule says: " * * * consisting of a number of houses and/or multi-family dwellings and incidental common facilities which are provided primarily for the benefit of the residents of said subdivision * * *." In the later and contested phrase the word "subdivision" obviously refers back to a subdivision as thus defined.

We find cases holding that the word "to" may be and frequently is used as a word of *inclusion* rather than *exclusion*. Thompson v. Reynolds et al., 59 Utah 416, 204 P. 516; Jeremy Fuel & Grain Co. v. Denver & R. G. R. Co., 59 Utah 266, 203 P. 863; People v. Poole, 284 Ill. 39, 119 N.E. 916; State v. Flutcher, 166 Mo. 582, 66 S.W. 429. But we do not believe that the issue in this case should be decided by a definition or a construction of that one word. The construction of this Rule (and of the contracts which are based upon it)

must be developed from its true intent and purpose, considering it as a whole. The purpose and intent were to furnish underground electric service *to the dwellings* in each subdivision and to require the owner to pay any excess of the cost incurred *in so doing* above 1.5 times the anticipated annual revenue *from those dwellings*. Stated in another way, the purpose of the controverted provision was to gear the cost of furnishing the underground service to the dwellings to the revenue to be obtained from those dwellings. The whole matter concerned the dwellings to be built, not a vacant tract of land or the boundary line of a subdivision. If we construe the meaning of "cost" as plaintiffs ask us to do, i. e., the cost of running underground lines *to the boundary* of the subdivision, that cost would have no logical relationship to the revenue to be obtained from the dwellings. Neither the Rule nor the contract even required defendant to run underground service outside the subdivision in order to reach it. All the underground wiring required was inside the subdivision; the contracts required "underground electric service facilities throughout the property * * *." The owners were not concerned about how defendant got the lines to the boundaries of the subdivisions; there is no indication as to how far the outside lines would be run,—from across the street, or for a mile or more. Plaintiffs wanted service in the subdivisions. Defendant wanted an assurance that the revenue from the dwellings would, within a fixed time, reimburse it for the cost of furnishing that service. When we consider the previous definition of a subdivision as consisting of dwelling units, it is clear that the term "to said subdivision" refers back to *such* a "subdivision" and means the cost of extension to the collection of dwelling units; anything else would make the cost and revenue provisions meaningless. Revenue "therefrom" (as used in the Rule) certainly means the revenue from the dwellings; there could be no revenue from lines outside the subdivisions, nor from a boundary line. Viewing this Rule and the

contracts as a whole, and considering the obvious purpose and intent, we hold that the phrase "underground extension cost to said subdivision" means the cost of extending that service to the dwelling units in the various subdivisions. The trial court so ruled, and we agree. Any other construction would render that part of the Rule rather ridiculous.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.