**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 99-1007
_____

| | |
|---|---|
| In re: Popkin & Stern, | * |
| | * |
| Debtor. | * |
| - - - - - - - - - - - - - - - - - - - - - - - - - | * |
| | * |
| Nancy Fendell Lurie, | * |
| | * Appeal from the United |
| Defendant - Appellant, | * States District Court |
| | * for the Eastern District |
| v. | * of Missouri |
| | * |
| Robert J. Blackwell, | * |
| | * |
| Plaintiff - Appellee. | * |

_____

Submitted: September 15, 1999
Filed: November 17, 1999
_____

Before MCMILLIAN, MURPHY, Circuit Judges, and BOGUE,[1] District Judge.
_____

BOGUE, District Judge.

_____

[1]The Honorable Andrew W. Bogue, United States Senior District Judge for the District of South Dakota, sitting by designation.

Appellee Robert J. Blackwell, in his capacity as Liquidating Trustee in Bankruptcy of the Popkin & Stern Liquidating Trust, filed suit against Appellant Nancy Fendell Lurie (hereinafter Nancy) in 1995. The trustee's amended complaint alleged violations of Missouri's version of the Uniform Fraudulent Transfers Act (UFTA). Mo. Rev. Stat. § 428.005 et seq. After a three day bench trial in 1996, the bankruptcy court issued judgment against Nancy on most counts. The district court affirmed on October 15, 1998. Nancy appeals.

## I. BACKGROUND

Popkin & Stern was a Missouri law firm in which Ronald Lurie (hereinafter Ronald) was a general partner. As part of a three member committee, Ronald was to oversee the liquidation of the firm's assets in 1991. In 1992, a Chapter 7 involuntary bankruptcy proceeding was initiated against the firm, which converted the case to Chapter 11. See 11 U.S.C. § 706(a). Robert J. Blackwell was appointed as trustee.

On August 27, 1993, the bankruptcy court confirmed a reorganization plan under which the former partners of Popkin & Stern agreed to contribute approximately $2.6 million to a Liquidating Trust. Ronald's share of the contribution was to be $361,704. Ronald signed a participant settlement agreement to finalize this settlement. To secure this obligation, which was evidenced by two promissory notes signed by both Ronald and his wife Nancy, the couple granted the trustee a deed of trust on their residence. The deed was third in priority to two mortgages. It provided that "[i]f all or any part of the Mortgaged Property is sold or transferred without [the trustee's] prior written consent, and if [the Luries] fail to pledge in place of the Mortgage Property such other collateral of like net value as may be acceptable to [the trustee], or cash, then the outstanding balance of the obligations shall immediately become due and payable without demand. . . ."

2

On December 1, 1993, the Luries sold their residence and netted approximately $288,000 without notifying the trustee. They deposited this sum in a joint investment account. In executing the sale, Nancy and Ronald signed an affidavit which stated that they did not "know of any facts . . . by reason of which any claim to any said property might be asserted adversely to me." The affidavit omitted any mention of the trustee's recorded deed of trust on the home. The title company failed to discover the trustee's lien and issued an owner's title insurance policy to support the closing.

On March 4, 1994, the bankruptcy court granted the trustee's emergency motion to enjoin the couple from transferring any assets until the sale proceeds were properly disbursed. The Luries paid the trustee the amounts due him from the sale of their residence three days later, but by April 1994, Ronald had defaulted on his obligation under the reorganization plan, and the trustee filed suit against him for the deficiency between the trust's assets and the claims against the trust. See 11 U.S.C. § 723. On October 20, 1994, the bankruptcy court entered judgment against Ronald in the amount of $1,121,743.

The action which forms the basis for this appeal was instigated on December 20, 1994, when the trustee filed an adversary proceeding against Nancy to avoid fraudulent conveyances from her husband to her. See 11 U.S.C. § 548(a). The trustee's amended complaint listed a number of separate allegedly fraudulent conveyances.[2] Prior to the

---

[2]The counts included a note in the amount of $60,000 securing settlement of a lawsuit by Ronald against William Wilkerson based on a loan made by Ronald to Wilkerson; a note executed by Ted Lipsitz in the amount of $40,000; stock in 1772, Inc.; stock in Dierdorf & Hart of St. Louis Union Station, Inc.; interest in PS Maryland, Associates II, a limited partnership; $11,437 in cash; $14,400 in cash; $77,000 in cash; a check issued to Ronald for legal services in the amount of $14,424.10; a check issued to Ronald by Jefferson Bank & Trust Co. in the amount of $129,979.45; April and May, 1994 payments to Ronald from United Oil Corp.; and Ronald's portion of $109,200 in proceeds from the sale of Ronald and Nancy's wine collection.

challenged transfers, all the assets had been in Ronald's name alone. With just one exception, the assets were all transferred to Ronald and Nancy jointly within one year of the bankruptcy filing.

Meanwhile, negotiations were undertaken in an effort to settle this adversary proceeding, as well as another adversary proceeding against Ronald's and Nancy's sons, and the aforementioned judgment against Ronald. The parties' efforts culminated in a Global Settlement Agreement (GSA). According to a ruling by the bankruptcy court, the terms of the agreement had to be performed by December 29, 1995. Thereafter, following a hearing, the bankruptcy court determined that not all the Lurie parties were able to perform their obligations, and that the GSA's release provisions were therefore not enforceable.

After Nancy's request for a jury trial in the adversary proceeding against her was denied, a hearing was held before the court on April 17-19, 1996. Nancy's position was that many of the assets in question were purchased with funds from her investment account which had been placed in the couple's joint checking account. She argued that these were thus assets owned by both spouses as tenants by the entirety and beyond the reach of Ronald's creditors. See Mo. Rev. Stat. § 428.009(2)(c). Detailed testimony was given and numerous exhibits received. The parties gave closing arguments in November 1997. Judgment was entered in favor of the trustee on all but one count on April 15, 1998.

The bankruptcy court found "as a general matter" that the testimony of Ronald Lurie was not credible. The court held that the trustee had demonstrated that each of the challenged transfers was fraudulent under Missouri law, see Mo. Rev. Stat. § 428.024, with the exception of the twenty-fourth count of the trustee's complaint. The court found that none of the assets in question had been held as tenants by the entirety, and that the challenged transfers had been made with the actual intent to hinder, delay and defraud Ronald's creditors.

4

In addition, the bankruptcy court found that Nancy's actions – such as her signing the false affidavit when the couple sold their residence – constituted ratification of her husband's fraud, that she had acted in concert with him, and that she should therefore be deemed a joint creditor for purposes of reaching any of the couple's entireties property. Finally, the court held that for purposes of execution, the judgment should be merged with the adversary proceeding judgment against Ronald. The district court affirmed and this appeal followed.

## II. DISCUSSION

Many of the Nancy's arguments question the sufficiency of the evidence on which the bankruptcy court based its findings, conclusions, and judgment. This is especially true of the first two of the issues she raises which questions whether any assets transferred by Ronald retained their tenants by the entirety characteristic, thereby falling outside the reach of UFTA, and whether the bankruptcy court erred in merging separately obtained judgments based on its finding that Nancy and Ronald acted jointly to commit fraud. We will not overturn the bankruptcy court's findings of fact unless they are clearly erroneous. Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985).

After a careful review of the voluminous record in this case, we are of the conviction that no clear error was made with regard to the bankruptcy court's findings as to the character of the assets at issue. Nancy's attempts to shield property from the reach of the trustee by arguing that the property remained tenants by the entirety property was rejected by the court based on sufficient evidence to the contrary. The property at issue was the subject of numerous transfers. "Certainly the acquiescence of one tenant by the entirety to the purchase (from the joint funds) of property taken in the name of the other would destroy the entirety interest. . . ." Cooper v. Freer, 385 S.W.2d 340, 345 (Mo. App. 1964). To the extent that Nancy advanced "tracing" arguments, the court found that she failed to meet her burden of proof. Instead, the

court held that the Luries' actions effectively severed the entireties character of the property at issue. We see no clear error in this conclusion.

In a similar vein, Nancy asks us to review the court's decision to merge separate judgments based on the joint acts of Nancy and Ronald to defraud the trustee. This decision was based on extensive evidence that Nancy and Ronald worked in concert to commit acts of fraud. See Mo. Rev. Stat. § 428.024.1(1) (defining fraudulent transfers as including those made "[w]ith actual intent to hinder, delay, or defraud any creditor"); Mo. Rev. Stat. § 428.024.2(1)-(11) (listing factors which may be considered in determining the existence of such an "actual intent" including whether the transfer was to an insider, the timing of the transfer, and whether the debtor retained control of the property following the transfer). Clearly, it was the joint actions of Nancy and Ronald which caused the default of Ronald's obligations under the participant settlement agreement. Because the merger of the judgments was based on sufficient evidence, our scope of review precludes any deeper analysis.

## A. Dismissal of Interlocutory Appeal

When the bankruptcy court denied Nancy's motion for a jury trial in her adversary proceeding, she filed an interlocutory appeal to the district court. On October 17, 1995, Judge Stohr ordered the parties "to file a stipulation for dismissal, a motion for leave to voluntarily dismiss, or a motion seeking for good cause shown, additional time to file a dismissal" no later than December 1, 1995. The order warned that "failure to comply would result in dismissal of the [appeal]." Nancy subsequently filed two motions for an extension of time in which to dispose of the matter, which were granted. The last order required Nancy to dispose of the appeal by March 1, 1996. Rather than follow this order, however, Nancy merely filed a status report. Consequently, the district court dismissed her appeal as a sanction for failure to

prosecute and comply with the court's orders. See Fed. R. Civ. P. 41(b). Her right to a jury trial before the bankruptcy court was thereby extinguished.[3]

We review the imposition of sanctions for an abuse of discretion. Rodgers v. Curators of Univ. of Missouri, 135 F.3d 1216, 1219 (8th Cir. 1998). "Dismissal with prejudice is an extreme sanction and should be used only in cases of wilful disobedience of a court order or . . . persistent failure to prosecute a complaint." Id. (citation omitted); see also Hutchins v. A.G. Edwards & Sons, Inc., 116 F.3d 1256, 1260 (8th Cir. 1997) (stating that a sanction of dismissal may be appropriate "where a litigant exhibits 'a pattern of intentional delay.'") (citation omitted). The district court's sanction must be proportionate to the litigant's transgression. Rodgers, 135 F.3d at 1219.

Here, the district court's sanction was prompted by a wilful failure to comply with the court's order. The adverse impact suffered by the Appellant as a result of the sanction was minimal since she did not forfeit her opportunity to have evidence received and her arguments heard by an impartial judge. Because the adverse impact on Nancy was proportionate to the egregiousness of her conduct, we find no abuse of discretion in the district court's dismissal. Having determined that the district court's dismissal of the appeal in which she raised her right to a jury trial should not be disturbed, we have no occasion to examine the underlying merits of the bankruptcy court's denial of that right.

## B. The Global Settlement Agreement

---

[3]Nancy appealed this dismissal to this Court which declined to hear her appeal due to lack of appellate jurisdiction. In re Popkin & Stern, 105 F.3d 1248 (8th Cir. 1997).

In 1995, during the trustee's adversary litigation against Nancy, the parties engaged in settlement negotiations in an attempt to resolve the litigation between the trustee, Ronald, Nancy, their two sons Michael and Ryan, and the creditors of Ronald and his law firm. The GSA was the result of those negotiations. It was comprised of three separately signed and dated documents – one signed by Ronald; one signed by Nancy; and one signed by Michael and Ryan Lurie. The fundamental purpose of the GSA was to effectuate a transfer of property from the Luries in exchange for a release of judgment against Ronald and the dismissal of proceedings against the Lurie family members. Because of the complicated and intertwining property interests of the Luries, an agreement that bound all of them jointly was necessary to execute the transfers of property and execution of documents required under the terms of the agreement.

In 1996, following a show cause hearing, the bankruptcy court found that Ronald and Nancy Lurie had failed to demonstrate that they could comply with their obligations under the GSA. Apparently, the Lurie sons were capable of performing their obligations under the GSA, although their parents were not. Nancy contends before this Court that the GSA was actually three separate agreements which did not bind all parties jointly, and that in any event the trustee settled and released his claims against her under the terms of the agreement. Both of these contentions were rejected below.

Several instruments constitute a single contract when they pertain to the same transaction and when the parties intend for them to be construed as such. Paglin v. Saztec Int'l, Inc., 834 F. Supp. 1184, 1192 (W.D. Mo. 1993); see also St. Paul Fire & Marine Ins. Co. v. Tennefos Constr. Co., 396 F.2d 623, 628-29 (8th Cir. 1968) ("[w]here several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other") (citation omitted). The GSA's language clearly indicates the parties' intent to execute a single agreement where it states, "This Agreement may be executed in counterparts, each of which shall be deemed to be an

original and all of which taken together shall be deemed to be one and the same instrument." Further, the GSA is explicit in the parties' intent that it bind all the parties jointly: "Provided that a Closing, as defined in this Agreement, has occurred, each provision of this Agreement is independent, and not interdependent. . . ." In other words, the agreement contemplated that the provisions of the GSA would remain interdependent until the exchange of performance, or closing, occurred.

Nancy's proposed interpretative spin on the GSA suggests that the trustee would agree to a settlement that would release the million dollar judgment against Ronald and the pending adversaries against Nancy and the two Lurie sons in exchange for the performance of the Lurie sons alone. By virtue of the express language of the GSA, the parties were not entitled to the benefit of their bargain if Ronald and Nancy were unable to comply with their obligations under the agreement. In seeking to ascertain the parties' intent, we give language its natural, ordinary, and common sense meaning, examine the entire contract, and consider the object, nature, and purpose of the agreement. Wilshire Constr. Co. v. Union Elec. Co., 463 S.W.2d 903, 906 (Mo. 1971) (citations omitted). Applying these principles, we agree with the bankruptcy court's construction of the GSA.

Nancy also attempts to suggest an untenable definition of the term "closing date" as used in the GSA. Unless it plainly appears that a different definition is intended, the meaning of a term in a contract will be the lay person's definition of that term. Rodriguez v. General Accident Ins. Co. of America, 808 S.W.2d 379, 382 (Mo. 1991) (en banc). The term "closing" generally refers to "the final steps of the transaction whereat consideration is paid. . . ." Black's Law Dictionary 231 (5th ed. 1979). A "closing date" would therefore ordinarily mean the date arranged for the final exchange of performance by the parties to a contract.

Nancy contends, however, that the parties intended that the "closing date" be defined as the thirtieth day following the court's approval of the settlement agreement,

9

regardless of whether all the assets had been conveyed. Therefore, she continues, the GSA's releases became effective automatically and all the rights and duties of the parties became fully operational whether or not any property was conveyed. She points to the following language in the GSA: "The closing of the settlement contemplated by this Agreement and the transfer of property and execution of all documents in connection therewith are to be consummated by [the parties] pursuant to the terms and conditions of this Agreement and shall be the 30th day after the date upon which the Approval Order of the Bankruptcy Court is entered. . . ." She argues that this language illustrates a clear distinction between the closing and the transfer of property.

We reject this reading of the agreement. Nancy's interpretation would require the trustee to release all the Lurie parties simply by the passage of time. Actual performance is generally a condition precedent to closing. E.g., Rimmel v. Mercantile Trust Co., 774 F.2d 279, 283 (8th Cir. 1985). A "closing," in other words, contemplates performance. The bankruptcy court concluded that the language of the GSA supports this common sense interpretation of the parties' use of the term, and we fully agree with this conclusion.

## C. Transfer Rulings

Nancy's final four issues deal with specific property and transfer rulings made by the bankruptcy court. As for her claims that the bankruptcy court erred in awarding the value of two promissory notes which it found had been fraudulently transferred, and in setting aside the transfer of a number of assets as fraudulent, the bankruptcy court's decision is supported by more than adequate evidence and a lengthy discussion of the factual bases for these rulings would serve no useful purposes. See Mo. Rev. Stat. § 428.024.1(2) (defining fraudulent transfers as including those made "[w]ithout receiving a reasonably equivalent value in exchange" while intending to incur debts beyond one's ability to pay them). The bankruptcy court found several "badges of fraud" in connection with these transfers. Because the court's detailed findings as to

10

the fraudulent nature of these transfers were not clearly erroneous, they may not be overturned.

Similarly, we will not disturb the bankruptcy court's factual finding as to the date on which Ronald transferred his interest in two corporations. (The date of the transfers becomes important under UFTA's four year statute of limitations found at Mo. Rev. Stat. § 428.049.) Ronald obtained an ownership interest in both 1772, Inc. and Dierdorf & Hart's of St. Louis, Inc. which he subsequently transferred to himself and Nancy jointly. Although the stock certificates from both corporations showed a transfer date of January 1990, the trustee introduced substantial other evidence on which the bankruptcy based its finding that the transfer actually occurred in 1992 and was recognized by the respective companies in 1993.[4] This finding was adequately supported by competent evidence and must therefore be affirmed.

### III. CONCLUSION

For the foregoing reasons, the decision below is affirmed in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]For example, corporate tax forms indicated that Ronald was the individual owner of stock through 1992; Ronald's 1991 financial statements represented that he was the sole owner; and corporate resolutions dated 1992 failed to recognize Nancy as a joint shareholder of either corporation. It was not until 1993 that the corporate tax forms identified the stock owners as Ronald and Nancy jointly.